

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00392-CV

IN THE INTEREST OF K.T., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98700J-13

----------

## MEMORANDUM OPINION[1]

----------

In two issues, appellant M.N. (Mother) appeals the trial court's order terminating her parental rights to five-year-old K.T. (Kyle).[2] She contends that the evidence is legally and factually insufficient to show that termination is in Kyle's best interest and that the trial court abused its discretion by naming the

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect the anonymity of children connected to this appeal, we use aliases to refer to them and to other people associated with the appeal. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8(b)(2).

Texas Department of Family and Protective Services (the Department) as Kyle's permanent managing conservator. We affirm.

## Background Facts

When Mother was a child, she witnessed domestic violence between her mother and her stepfather, an experience that was traumatic for her. Mother was raped when she was sixteen years old. She was also physically abused by her father as a child.

In 2007, when Mother was approximately twenty-one years old and living in New Mexico, she met K.T. (Father). She began living with him and eventually conceived Kyle with him. Mother and Father had physical and verbal fights that resulted in the police being called. When Mother was nine months pregnant with Kyle, her argument with Father resulted in the police's presence at their residence, and Father was arrested.

Mother gave birth to Kyle in January 2009. Weeks later, in March 2009, Mother discovered that Father was cheating on her. She and Father began to fight. During the fight, Mother was holding Kyle, and Father began beating her. When Father attempted to take Kyle out of Mother's arms, he broke Kyle's arm. Mother grabbed Kyle and began to run, but Father chased her. Mother then put Kyle down, and Father beat her again until his cousin arrived at the residence. Father was confined based on that incident.[3]

---

[3]A New Mexico grand jury indicted Father for abusing Kyle. Father pled no contest to the felony offense, and a court convicted him, sentenced him to three

Although Mother's aunt, L.G. (Laura), who lives in New Mexico, believed that Kyle would not be safe around Father and told Mother to stay away from Father after that incident, Mother began living with him again after his release from confinement. Mother consistently fought with Father in front of Kyle. In October 2009, Father again beat Mother. During another incident, he threw her phone into a street and broke it. As late as September 2010, Mother was still living with Father and having domestic disputes with him.

Mother told the police that she and Father had several more physical altercations that she did not report. Laura testified that Mother "forgave [Father], and she went back to him a few times."

In February 2011, to get away from Father, Mother moved to San Antonio and began financially supporting herself. She testified that she did so because she feared for Kyle and "knew [she] wasn't strong enough to stay in New Mexico if [Father] were to get out of prison." During part of the time that Mother lived in San Antonio, Kyle lived with Laura and her husband (Mother's uncle), V.G. (Victor).

In February 2013, Mother and Kyle moved to Arlington to live with her boyfriend, D.R. (Daniel), whose parents live in New Mexico. Laura and Victor met Daniel and believed that he was respectable.

---

years' confinement, and suspended imposition of part of the sentence so that Father could be placed on supervised probation. Father later claimed that Kyle's broken arm was Mother's fault. He said that he and Mother were having an argument and that she kicked him, which caused him to drop Kyle.

In the middle of June 2013, Mother began noticing some injuries on Kyle. By June 26, 2013, Kyle's injuries had cleared up significantly. On June 27, 2013, when Mother left for work, Kyle appeared normal. But when Mother came home from work that day, she found Kyle with an assortment of injuries, including bruises to his stomach and face and a bite mark on his thigh. Mother believed that his babysitter had injured him and took him to a hospital. Laura asked Mother whether Daniel, who was living with Mother at the time, could have abused Kyle, and Mother stated that she did not believe that he could have done so.

Sylvia Anderson, who was working as a night response investigator with the Department, received a report about Kyle's injuries and went to the hospital to assess them. At the hospital, Mother cooperated with the investigation; she told Anderson about her and Kyle's history of abuse with Father and stated that Kyle had been with Daniel on that day. But Mother told Anderson that the "only person that could [have] hurt [Kyle was] the babysitter."

Anderson noticed that Kyle had bruises in different stages of healing from head to toe, swollen eyes, a busted lip, and a bite mark on his left thigh. Anderson asked Kyle whether anyone had ever hit him. Kyle lowered his head "and stated that [Daniel had] hit[] him when he [got] mad and that [Mother had

stated that] if anybody asked what happened to him to tell them that he fell."[4] Anderson spoke with Daniel, who seemed nervous and agitated before ending the interview and leaving the room. When Anderson told Mother about Kyle's statement that Daniel had hit him, Mother "said that there was no way that [Daniel] could have done [that]." The Department removed Kyle from Mother's custody. Mother continued living with Daniel.

Jeremy Dickinson, one of the Department's employees, investigated Kyle's injuries after his removal from Mother's custody. Mother told him that Kyle had been staying with a babysitter on some days in June 2013 and that one day when she had picked him up from there, she had noticed a rash under his eyes and a bruise under his chin. Mother also said that later that month when Kyle had spent time with the babysitter, she had picked him up and had not noticed any bruises or marks. Mother told Dickinson that on June 27, she had left Kyle in Daniel's care for an entire day when she went to work, and when she returned home, Kyle's face had become swollen enough for her to take him to a children's hospital. According to Mother's statement to Dickinson, on the way to the emergency room, Daniel began having an anxiety attack, so she went to a

---

[4]Mother denied that she ever told Kyle to say that he fell; instead, she testified that she had "asked him what happened[,] and [he had] told [her] he fell down."

5

general hospital that could treat both Kyle and Daniel.[5] In response to Dickinson's questioning, Mother denied that Daniel could have been responsible for Kyle's injuries.

The Department filed a petition that asked the trial court to terminate Mother's and Father's parental rights to Kyle if reunification could not be achieved. The Department attached an affidavit to the petition that detailed Kyle's injuries, including that his face had been "pummeled." The same day that the Department filed its petition, the trial court entered an order naming the Department as Kyle's temporary sole managing conservator. Later, after holding an adversary hearing,[6] the trial court continued its appointment of the Department as Kyle's managing conservator.

Soon after Kyle's removal, Mother visited him at a Child Protective Services (CPS) office in Arlington. By that time, Dickinson had told Mother about Kyle's statements identifying Daniel as his abuser. According to Dickinson, at the end of that visit, without any prompting, Kyle said, "Mommy, [Daniel] hurt me and hit me," and he began crying. After the visit ended, while crying, Mother told

---

[5]Mother testified that she had never stated that Daniel had an anxiety attack. Instead, she testified that she had persuaded Daniel to seek treatment for anxiety after they arrived at the hospital.

Two weeks after he abused Kyle, Daniel had a seizure and was admitted to a hospital, where he stayed for a couple of weeks. Months later, Daniel returned to the hospital to have brain surgery.

[6]*See* Tex. Fam. Code Ann. § 262.201(a) (West 2014).

6

Dickinson that she believed Kyle but that she "just [couldn't] believe that [Daniel] would do that." Mother made similar statements to Dickinson on other occasions. After Dickinson contacted the babysitter, he believed that she could not have been responsible for Kyle's injuries.

Dickinson believed that Mother was "more supportive of [Daniel] than [Kyle]"; he did not believe that Mother "fully supported her . . . physically abused son." Dickinson concluded that Mother had neglectfully supervised Kyle because there were old and new bruises that Mother had overlooked.

Days after Kyle's removal, Victor wrote a letter to the "Texas court system" attesting to Daniel's character. The letter stated that Daniel had showed "tender loving care" to Kyle and that Daniel was a "calm, gentle[,] and respectful young man." Victor wrote that Daniel had never demonstrated anger or uncontrolled emotions and that Daniel would never deliberately hurt anyone, and he urged an investigation to find the "true culprit" of Kyle's abuse.

Mother continued to visit Kyle every two weeks from July 2013 through the middle of November 2013. According to Concepcion Martinez, Mother's first caseworker, the visits went well; Mother interacted with Kyle and prayed with him. From watching the visits, it became evident to Martinez that Kyle loved Mother.[7] Mother asked Martinez if Daniel could attend the visits, and Martinez

---

[7]Mother was not satisfied with Martinez's work as a caseworker; she complained about Martinez's unprofessionalism and refusal to return phone calls. Martinez testified that Mother regularly called her and left messages. Laura testified that Martinez placed "stumbling blocks" that led to the Department's

explained that it would be inappropriate for Daniel to do so because Kyle had named Daniel as his abuser.

In July 2013, Mother brought Daniel to a hearing concerning Kyle's custody. By August 2013, Mother still believed that there was only a "possibility" that Daniel was the person who had abused Kyle. Martinez presented a service plan to Mother that month; Martinez described the purpose of the plan as helping Mother eliminate the risk that led to Kyle's removal from Mother's care. At that time, Mother was still in a relationship with Daniel and was residing with him, so Martinez also prepared a service plan for him. Mother eventually completed all of the services in the plan, including anger management, counseling, and classes aimed at stopping domestic violence.

While Mother was living with Daniel in Texas after Kyle's removal, she had sex with him a few times. Mother moved back to New Mexico in November 2013 in what she testified was an attempt to get away from Daniel.[8] By that time, she and Daniel had conceived a child. Mother gave birth to M.R. (Michael), in December 2013.

---

decision to seek termination of Mother's parental rights. According to Laura, Mother and Martinez shared fault for the Department's goal of terminating Mother's parental rights. Mother testified that when she spoke with Martinez, Martinez twisted her words or made her feel threatened. She opined that Martinez was "always . . . against [her]." Martinez was mother's first caseworker, but she no longer worked for the Department at the time of trial.

[8]Laura testified that she and Victor encouraged Mother to return to New Mexico in November 2013.

Mother did not attend a visit with Kyle in December 2013 or January 2014. Thus, when she traveled from New Mexico to Texas to attend a visit in February 2014, she had not seen Kyle in approximately three months. Martinez advised Mother that after she moved back to New Mexico, she could maintain contact with Kyle through seeing him on the Internet. But according to Martinez, Mother did not maintain consistent contact with Kyle that way. Mother missed a court hearing in January 2014; she testified that she did not receive notice of the hearing from the Department or her attorney and that she would have attended the hearing had she known about it.

In January 2014, the trial court received a progress report in which the Department stated that its primary goal was Kyle and Mother's reunification. The report explained that Mother had completed many of the requirements of her service plan and had regularly visited Kyle.

Laura and Victor wanted to adopt Kyle, so they participated in an in-depth home study and obtained a foster care license. Laura and Victor cared for several foster children, including some children less than two months before trial. In February 2014, Kenyatti Tricksey, a CPS supervisor, received the completed home study of Laura and Victor's residence in New Mexico. While Tricksey was not concerned about any details in the home study, she declined to place Kyle with Laura and Victor because she was not convinced that they believed Kyle's outcries that named Daniel as his abuser. Specifically, based on Tricksey's

conversation with Laura, Tricksey believed that Laura "wanted to continue to defend [Daniel's] credibility and his character." Tricksey explained at trial,

> The home study was beautifully written. The contractor did a great job documenting the conversation, I believe, and the visits to the home. My concerns stem from conversations outside of the home study with the family and the fact that this child would be many, many hours away from Texas and that we couldn't be able to go out and talk with him or visit with him as often as we would like, considering the fact that we had potential . . . caregivers that were kind of straddling the fence on whether or not they believed what happened to him happened the way it did.

Tricksey never met with Laura and Victor in person, and she never visited their home in New Mexico. She recognized at trial that Laura and Victor are responsible and that they do not have a criminal history, and she conceded that the New Mexico authorities who had completed the home study gave Laura and Victor "glowing reviews."[9]

In February 2014, Laura sent an e-mail to Kyle's Court Appointed Special Advocate (CASA), Dianne Ward, because she was not convinced that Daniel had abused Kyle, and she wanted to support Daniel. The e-mail stated,

> Pictures of [Kyle]. I hope you don't think that I overdid it, someone needs to see . . . what we have seen. My niece has tons of more pictures . . . like these. The few months that they were in Arlington were the happiest we have seen both my niece and [Kyle]. On [F]ather's Day of last year my niece called me to tell me that [Kyle] had called [Daniel] "Dad." We both cried together knowing that [Kyle] had lots of love for [Daniel]. We have been told that this

---

[9]The home study classified Victor as "articulate, engaging, intelligent, passionate[,] and strong." It described Laura in similar terms. It explained that Victor and Laura had been married for sixteen years and that they had no criminal history or substance abuse issues.

man was beating on [Kyle] for a very long time every day, yet these picture[s] . . . show nothing like that.

To the e-mail, Laura attached several pictures of Daniel and Kyle together. Laura testified that when she sent this e-mail, she was not sure whether Daniel had abused Kyle. On one occasion when Ward approached Laura about Kyle's statements naming Daniel as his abuser, she said, "Words from a child can be misunderstood."[10]

Upon her move back to New Mexico, Mother told Martinez that she and Daniel were no longer in a relationship. But Daniel eventually followed Mother there. In February 2014, Mother had sex with Daniel. She testified that she did not want to have sex with him, explaining,

> He went to go visit his son. He put [Michael] down to sleep, and I expected he was going to leave my home, and he kept bugging me because he wanted to have sex, because I hadn't had sex with him in a very, very long time. And he kept bugging me and I gave in . . . . I didn't want to have sex with him, but I've been raped before, and I don't want to go through that again. . . . I just figured it's easier to just give in. I was raped when I was 16. And I didn't want to have sex with him, but . . . I didn't want to relive that again.

Mother did not tell Martinez about her claim that Daniel had pressured her into having sex with him in February 2014; she explained at trial that she was ashamed and did not want anyone to know that Daniel was doing so.

---

[10]Laura explained at trial that a previous incident with her son, when he was two or three years old, had taught her that children may claim to be abused because they are coached or because they see "[something] on television."

11

In March 2014, Daniel went to Mother's apartment in New Mexico while wanting to see Michael. Mother let him spend the night on a sofa. The next morning, Mother saw a pipe in Daniel's pocket and told him to leave the apartment. In response, he threw a rock at her window and broke it. Michael was asleep during this incident. When Mother told Laura about what had occurred, Laura became angry because she had instructed Mother to not allow Daniel to stay at the apartment. New Mexico police arrested Daniel.

At trial, Mother recognized that allowing Daniel to visit her and Michael at her apartment in March 2014 was not a good idea. But she also conceded that soon after this incident, she took Michael to visit Daniel, who was still confined in jail. Mother conceded at trial that taking Michael, who was three months old, to visit Daniel at the jail was likewise not a good idea. Daniel was eventually transferred to a Tarrant County jail to face charges for abusing Kyle.

Regarding the March 2014 incident between Mother and Daniel, Martinez testified, "[Daniel] was spending the night at [Mother's] apartment. They engaged in a domestic violence dispute. She refused to press charges. . . . And they engaged in domestic violence given [that] her baby [Michael] was in the home." When Martinez learned of the incident through a police report and confronted Mother about it, Mother told Martinez that the police officer had "made up" a statement in the report that Mother had told the officer that Daniel was her boyfriend. But Mother admitted that Daniel had spent the night, that he had

brought drugs into her apartment, that he had broken her window, that he had threatened her, and that she was not pressing charges against him.

Laura conceded that after Daniel broke the window of Mother's apartment, Mother did not want to press charges against him even though Laura advised her to do so. And Laura also testified that even after that incident, Mother allowed Michael to visit Daniel (along with Daniel's family) in Texas in May 2014, just four months before the trial began. Mother testified that she had left Michael in Daniel's care but that she had ensured that Daniel would not be alone with Michael.

As a result of having sex with Daniel in February 2014, Mother became pregnant with her second child through him. But in April 2014, she miscarried. The miscarriage caused Mother to miss a telephone visit with Kyle. When Mother miscarried, she told Martinez only that she had an "abnormal tissue" in her uterus and did not disclose that she had been pregnant or that she had engaged in sex with Daniel. When Martinez asked Mother whether she had been pregnant, Mother denied that she had been because she knew that "it was wrong" and would reflect poorly on her. Mother's second pregnancy by Daniel concerned Martinez because it indicated that Mother was still in a relationship with Daniel and was not protecting Michael.

Maisha Akbar replaced Martinez as Mother's caseworker in May 2014. Mother told Akbar then that she still believed that the babysitter had caused Kyle's injuries. She also told Akbar that she continued to love Daniel. Mother

13

told Akbar that she, Daniel, and Kyle had a "great relationship." She showed Akbar several pictures of Daniel and Kyle and asked Akbar whether Daniel looked like someone who would hurt Kyle. Mother told Akbar that Daniel had a right to be around Michael and that they "need[ed] to have a relationship together because [Daniel is Michael's] father." Mother told Akbar that she did not intend to keep Daniel away from Michael.

By May 2014, the Department's primary goal for Kyle became the termination of his parents' rights and adoption by an unrelated family. A document filed near that time expressed the Department's concerns that Mother did not believe Kyle's statements about the abuse he had received from Daniel and that she had placed her own needs and desires above Kyle's needs.

Daniel pled guilty to abusing Kyle in early August 2014. He confessed that he had committed "each and every act" alleged in the indictment, which included hitting and biting Kyle. A court deferred its adjudication of Daniel's guilt and placed him on community supervision for four years. A condition of Daniel's community supervision required him to avoid contact with children under seventeen years old. When Mother learned that Daniel had pled guilty, she still questioned whether Daniel bit Kyle. Laura testified that she was surprised to learn that Daniel had pled guilty because he had always denied abusing Kyle.

At the time of the trial, Mother was twenty-eight years old and was living in a one-bedroom apartment in New Mexico for which she was paying $360 per month. She had been living there with Michael, who was less than a year old, for

14

several months preceding the trial. Mother's apartment had a crib for Michael and a bed reserved for Kyle. Mother worked for General Dynamics and took classes at a community college. Before that, she had worked for two car dealerships. Daniel was living in Arlington after being transported to Texas because of his charges for abusing Kyle.

Mother acknowledged at trial that from the time of Kyle's removal, CPS expressed concerns to her that she was not protecting Kyle but that she was instead protecting Daniel by not believing that he had hurt Kyle. But Mother testified that she had always believed that Daniel had done "something" to Kyle. She testified that she was "[a]ngry, disgusted, and furious" when she learned that Daniel had pled guilty to hitting and biting Kyle.

Mother asked the trial court to not terminate her parental rights, explaining, "I have done everything asked of me to get my son back, and I have worked really hard. And I'm willing [to] do anything to protect my son because I love my son very much . . . ." Concerning her commitment to keep Kyle safe, Mother testified,

> I will do anything. I will work with New Mexico CPS. They could drop into my house every single day for the rest of my life. I don't care. I just want my son back.
>
> . . . .
>
> . . . I'll take whatever class is necessary. I'll -- I want to get into counseling. I plan on getting into counseling because I know myself. I need counseling with all I have been through.

15

Mother recognized that she had previously made mistakes in the "type of men" she had chosen, but she explained that she had since changed her surroundings and had "devoted [her] life to God." She also explained that her family, including Laura and Victor, could help her support Kyle. Mother testified that Victor had a military background, was very strict, and would not welcome Father or Daniel into his home. She explained that Laura and Victor are respected in their community and that there would be "no better place" for Kyle than to live with them.

At trial, the Department did not propose that Mother's parenting of Kyle was deficient in any way unrelated to her failure to ensure his physical and emotional safety and stability. The evidence showed, for example, that Mother kept an appropriate home, interacted with her children well, was attentive to them, ensured that they were developmentally on target, did not have a significant criminal record, and had not abused drugs or alcohol.

After the end of the bench trial, the trial court terminated Mother's and Father's parental rights to Kyle.[11] The court found that clear and convincing evidence showed that Mother had knowingly placed or allowed Kyle to remain in conditions or surroundings that endangered his physical or emotional well-being, that she had engaged in conduct or knowingly placed Kyle with persons who engaged in conduct that endangered his physical or emotional well-being, and

---

[11]At the time of the trial, Father was incarcerated. Father has not appealed the termination of his parental relationship with Kyle.

that termination of her parental rights was in Kyle's best interest.[12]   The court named the Department as Kyle's permanent managing conservator.   Mother brought this appeal.

## Kyle's Best Interest

In her first issue, Mother contends that the evidence is legally and factually insufficient to prove that termination of her parental rights is in Kyle's best interest.  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."  *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).  We strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

---

[12]*See* Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, art. 1, § 1.078, sec. 161.001(b)(1)(D)–(E), (2) (West) (to be codified as an amendment to Tex. Fam. Code Ann. § 161.001).  We cite to the current version of section 161.001, but we note that the recent amendment to the statute does not affect our resolution of Mother's first issue.

Termination decisions must be supported by clear and convincing evidence. Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, art. 1, § 1.078, sec. 161.001(b); *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802. For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, art. 1, § 1.078, sec. 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder

18

could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship was in Kyle's best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually

19

insufficient. *H.R.M.*, 209 S.W.3d at 108. The fact that there might be some evidence favorable to the parent does not mean that the evidence is factually insufficient to support the judgment. *In re L.S.R.*, 60 S.W.3d 376, 381 (Tex. App.—Fort Worth 2001), *pets. denied*, 92 S.W.3d 529 (Tex. 2002).

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *In re R.R.*, 294 S.W.3d 213, 234 (Tex. App.—Fort Worth 2009, no pet.). In determining the best interest of the child, we may consider, among other factors, the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *E.N.C.*, 384 S.W.3d at 807; *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating that in reviewing a best interest finding, "we consider . . . the *Holley* factors" (footnote omitted)).

20

**Kyle's past harm and future danger**

Much of the testimony at trial concerned Kyle's history of being physically abused by men who had relationships with Mother, Mother's inability to protect Kyle from those men, the Department's position that she had valued her relationships with those men over Kyle's safety, and her refusal, for the majority of the time that the case remained pending in the trial court, to acknowledge that Daniel had abused Kyle. The evidence showed that Mother had relationships with two men—Father and Daniel—who had abused Kyle and that she continued those relationships after the abuse occurred.

Father abused Mother at least twice before he broke Kyle's arm, and after he broke Kyle's arm, he again assaulted her. Concerning the multiple chances that she gave Father even after he had consistently abused her, Mother testified,

> He went to jail for four months and then he got out. And, yes, I did give him a chance to see if he was going to change. And then when he went to prison we weren't together anymore, and I had already stopped giving him chances. And at that time, I was very young and I was naive. And at that time, I thought that it was best for my son to have both a mother and a father. And I . . . wasn't thinking correctly, and I was afraid to be a single parent. And so it took a lot for me to realize, and I do regret every single time, and I regret it that [Kyle] had to go through that.

Mother continued to have a relationship with Father for more than a year after Kyle's arm was broken during Mother and Father's domestic dispute.

Kyle had bruises "all over [his] body" when he was admitted to the hospital in June 2013 after spending a day with Daniel. The records from his hospital stay state that he had "scattered circular bruises to all extremities" that were in

21

different stages of healing. According to those records, Mother noticed these bruises after coming home on a day when Daniel had been exclusively caring for Kyle, but she told personnel at the hospital that the bruises were caused by Kyle's babysitter.

Even though Mother testified that in June 2013, she had "believed there was a big possibility" that Daniel abused Kyle, she stated that she had not separated from Daniel at that time because she had felt "helpless" and could not afford other housing. She explained that although she was still living with Daniel after Kyle's removal from her custody, she had "stayed in [Kyle's] room, and [she had] cried and cried." Mother also testified that when she had left the hospital on the night that Kyle was taken there because of his injuries, she had been "confused" about who had caused them.

Long before the trial court terminated her parental rights to Kyle, Mother knew that the Department was displeased with her attitude toward Daniel and her continued relationship with him. But she testified that on the night Kyle went to the hospital, she had confronted Daniel about what happened, and he had denied abusing Kyle. She also explained that she had confronted him on other occasions before he pled guilty and that he had continued to deny abusing Kyle.

When Mother spoke with a New Mexico CPS investigator in January 2014, she said that she "wasn't sure what to believe" about who had abused Kyle and that Daniel was "always a very good person to . . . [Kyle]." Mother first learned that Daniel had been arrested for abusing Kyle in March 2014. Mother testified

that she had questioned what she learned from the Department about Kyle's abuse because the Department had incorrectly included information on an affidavit following Kyle's removal. Concerning what she had learned directly from talking to Kyle about the abuse he suffered, Mother testified,

> My son has told me that his dad has spanked him, and where the possibility comes into play, spanking is different from hitting in the face. So I figured there's a possibility that [Daniel] could have hit him in the face, but from what [Kyle] was telling me, [Daniel] spanked him and [a child] bit him, and he told me a lady smashed his toe.

Mother recognized at trial that Daniel had abused Kyle. She testified,

> I believed [Kyle] at the beginning. I believed [Kyle] when he would tell me. It was hard for me to believe, but I believed [Kyle] from the beginning . . . [but] it was confirmed when I found out that [Daniel] pled guilty. It was just confirmed.

Mother admitted, however, that on numerous occasions, she had asked the Department to investigate whether Kyle's babysitter could have been responsible for his injuries. At trial, she opined that both Daniel and the babysitter had caused Kyle's injuries, but she agreed that Kyle had not seen his babysitter on the day that she discovered his extensive injuries and took him to the hospital.

Upon first reviewing the case in July 2013, Martinez (Mother's first caseworker) was concerned about Mother's pattern of placing Kyle in unsafe environments, exposing him to abuse, and not believing his outcries. When Martinez told Mother about Kyle's consistent outcries that Daniel had abused him, Mother responded that she "didn't believe that [Daniel] could hurt her son."

23

Martinez testified that Mother never conceded to her that Daniel had hurt Kyle. When Martinez was asked to describe Kyle's condition upon his removal from Mother and his placement in foster care, she testified,

> [Kyle] was very apologetic, always tripped and fell . . . . He would wet his pants at times. He would be afraid of getting in trouble.
>
> At times throughout the case, depending on the situation, he would regress and go back to -- he improved in regards to wetting. He would regress and poo or pee in his pants. He had a lot of anxiety, a lot of [post-traumatic stress], which he would relate to the abuse.

Martinez testified that to achieve reunification with Kyle, Mother needed to believe his outcries and demonstrate that she could protect him by removing herself from Daniel, who had hurt him. But Martinez testified that Mother "kept not believing [Kyle's] outcries no matter what [Martinez] would try to tell her." Martinez said that the Department's plan for Kyle changed from his reunification with Mother to the termination of her rights because the Department

> had concerns in her engaging with [Daniel], not being protective, [and] still not believing [Kyle's] outcries. We also had concerns that she had not demonstrated the skills that she was to learn while she was doing her service plan.
>
> She did complete [a domestic violence prevention class], but, yet, here in [March 2014] we see her again in an altercation of domestic violence. And, once again, she failed to be protective. She . . . did not press charges.[13]

---

[13]Martinez testified that Mother had told her that she did not "press charges," but Martinez acknowledged that Mother had called the police after Father broke her window.

Ward (the CASA advocate) recommended the termination of Mother's parental rights. She explained that based on Mother's history of continuing relationships with both Father and Daniel after they had hurt Kyle, Mother had not "demonstrated a willingness or an ability to protect [Kyle] from someone that may want to harm him." She stated,

> [T]hrough my review of records and in speaking with other professionals involved in this case, I have not seen any indication that there's been a change in behavior. I'm afraid that [Mother] has continued to enter into relationships with someone that is abusive and I'm concerned about [Kyle's] safety if he's returned to her.

Mother testified that she could prevent exposure of Kyle to further harm by staying away from Daniel and other men. She explained, "I don't allow myself to be around negative people or around people that I . . . know . . . can become violent. I kind of basically just surround myself with positive people now . . . ." Mother agreed, however, that her decision to have sex with Daniel in February 2014 was inconsistent with her professed desire to stay away from him. And Mother conceded that she was not protecting Michael when she allowed Daniel to stay at her house and when she had sex with Daniel; she recognized that being around Daniel creates volatility. Mother did not tell anyone in February 2014 about her claim that Daniel had pressured her to have sex with him. Mother testified that she did not know why she brought Daniel to court with her in July 2003 even after Kyle had named Daniel as his abuser.

Tricksey (a CPS supervisor) testified that because Mother and Daniel shared a son together, "[i]t [would] be very difficult for [the Department] to be

25

convinced that [Kyle] wouldn't be around [Daniel] anymore" if Kyle was returned to Mother's custody. Concerning Mother's decision to drop Michael off for a visit with Daniel in Texas during the summer of 2014, Tricksey testified, "[H]aving someone who has been accused by her son as harming him, allowing a child that can't talk, can't defend himself to be alone with [Daniel] is very concerning." Tricksey also testified, "If [Mother became] pregnant again by the same person that hurt her son, then her intentions . . . show that . . . she can't keep her children away from abusers." Tricksey noted that since Michael's birth, Mother and Daniel had an incident of domestic violence in New Mexico, when Daniel threw a rock through Mother's window. Tricksey acknowledged that when she had talked to Mother on the telephone, Mother had said that she wanted whoever abused Kyle to be punished. But Tricksey testified that Mother could have shown a willingness to protect Kyle by "not being around the person . . . that hurt him."

Mother recognized that her most important duty as a parent is keeping her children safe. But although she stated that she would not be willing to let Kyle see the babysitter that had cared for him preceding Daniel's abuse of him, she could not explain why she had asked for Daniel to see Kyle after the abuse occurred. Mother testified that she no longer loves Daniel, but Akbar testified that Mother told her in May 2014 that she still loved him. When asked how she had demonstrated a willingness to protect Kyle from people who had harmed him, Mother testified,

26

I'm fighting for my son. I'm currently fighting for him because I feel that it's not just [Daniel] who's harming my son. I feel he's being mentally abused by being away from me. And I believe that's a part of protecting my son and fighting for him, for his happiness and for his safety, for his mental stability.

Akbar (Mother's caseworker at the time of the trial) expressed her concern about Mother's "cycle of being in abusive relationships and not leaving the men . . . [she is] in those relationships with." Akbar recognized that the termination of Mother's parental rights would require the end of Kyle's relationship with his brother Michael, but she testified that termination was nonetheless in Kyle's best interest because "the [most] important thing . . . is [Kyle's] safety. So if . . . it's not in [Kyle's] best interest to be with his mother because he won't be safe, then we have to follow through with that."

Akbar testified that Mother had never talked to her about Daniel's guilty plea for abusing Kyle. Regarding Mother's failure to tell her about the plea, Akbar testified,

[Mother] . . . believe[d] it was the babysitter. [She] continued that throughout . . . my four months being on the case.

So I think that [Mother would] call me and let me know at least, Hey, did you hear about [Daniel] being convicted. Oh, my God, I can't believe that he got convicted.

Akbar also testified that although Mother had known in March 2014 that Daniel was arrested for abusing Kyle, she had still expressed her belief that Daniel should be able to visit Michael. Akbar testified that Mother "was in a cycle of being with men that abused her children."

27

Laura (Mother's aunt) acknowledged that Mother had not used good judgment during her relationships with Father and Daniel. She admitted that when Mother had continued her relationship with Father after he had hurt Kyle, Mother was not protecting Kyle. She also testified that even after Daniel had been criminally charged with abusing Kyle, Mother had remained unsure about whether Daniel injured him. Laura testified that one or two months before the trial, Mother took Michael to Daniel for a visit and left. Laura told Mother that dropping Michael off with Daniel was not a good idea, but Mother did not heed her advice. Laura opined that "no child should be present when people are fighting." She expressed that she did not "agree with what [Mother] did" by continuing an intimate relationship with Daniel after he was suspected of abusing Kyle.

Victor testified that he had advised Mother to end her relationship with Father when Mother had spoken about how Father abused her. He conceded, however, that for some time thereafter, Mother had maintained her relationship with Father. Victor agreed that it is important for a parent to protect a child, and he acknowledged that Mother had "made mistakes" in doing so.

Angela Tellez, a New Mexico permanency worker, received a request in April 2014 to investigate Mother's home and evaluate her abilities to parent. Tellez's search of Mother's background revealed the incident that had occurred the month before when Mother forced Daniel to leave her apartment and he threw a rock through her window. Tellez spoke with Mother in April 2014 and

confirmed that no one was living in Mother's apartment at that time other than her and Michael.

Tellez recommended Kyle's placement with Mother because Mother could "articulate a safety plan to protect [him] from [Daniel] and also from any other person" and because Mother had a "great deal of family support in New Mexico . . . who would be willing to help be a safety monitor if need be." According to Tellez, in April 2014, Mother "was sure" that Daniel had not hurt Kyle and that the babysitter had abused him. Mother minimized Kyle's injuries when describing them to Tellez. Nonetheless, Tellez stated that Mother had agreed to keep Daniel away from Kyle. Tellez testified that Mother had moved to New Mexico to protect Kyle, opined that Mother had put Kyle's interests over her relationship with Daniel, and recommended to the court that Kyle be returned to Mother's custody.

On cross-examination, Tellez testified that Mother had not told her in April 2014 that she had recently had sex with Daniel and had been pregnant with Daniel's child, that Daniel had made recent threats against her, or that Daniel had been arrested and transported to Texas concerning charges for abusing Kyle. Tellez admitted that if Mother had told her that she had sex with Daniel after he pressured her to do so in February 2014, Tellez would have "question[ed] [Mother's] ability to protect" Kyle and would have changed her recommendation. She also explained that Mother had represented that she had visited Kyle at least once per month although Mother had not visited him in

29

December 2013 or January 2014.  Mother told Tellez in April 2014 that Daniel was a "very good person" even though in the prior two months, Daniel had pressured Mother to have sex with him, had thrown a rock through her window, and had been arrested and transported to Texas for charges of abusing Kyle.

**Mother's relationship with Kyle, her plans for him, and her parental abilities**

The evidence showed that Mother has a warm, nurturing relationship with Kyle.  She visited with Kyle on nearly twenty occasions from the time of his removal until the trial, although she did not see him in December 2013 or January 2014.  By all accounts, these visits went well.  During the visits, Kyle was joyful and excited; he hugged and kissed Mother, and they sang and drew pictures together.

Kyle met Michael through visitation; Laura testified that they had bonded and that Kyle knew that Michael was his brother.  Laura stated that Mother had missed Kyle and had repeatedly cried for him.

Near the time of the trial, Mother was working full days for General Dynamics while Laura took care of Michael.  Laura testified that she would be willing to also watch Kyle so that Mother could continue working.  Mother also has other family members living in New Mexico who could help her support Kyle.

According to Laura, Mother does not drink or take illegal drugs, does not have a criminal record, and is "very hard working."[14]  Laura expressed that

---

[14]Mother testified that she does not drink alcohol consistently or use drugs.

Michael was flourishing while in Mother's custody. She opined that Mother is a very good parent and testified that Mother has never left Kyle with anyone alone without planning to return for him.

Victor explained that he and Laura had provided for Mother "[f]inancially, morally, and with God's spirit." He described Mother as a wonderful parent who "loves her kids [and] loves God."

Ward recognized that Mother and Kyle interacted well with each other during visits, including singing together and making up stories. She acknowledged that Kyle is very bonded to Mother. She recognized that the termination of Mother's rights would not likely be easy for Kyle and that it could possibly cause him emotional trauma.

When asked to describe her relationship with Kyle, Mother said,

We love each other very much. We hug each other every chance we get. I smother him with kisses. We're just -- I always make sure he knows that I love him. I tell him I love him very often, and he tells me the same. And we . . . don't like to be apart from each other.

Mother testified that she and Kyle had shared many activities together, including drawing, painting, dancing, singing, and hiking. Mother had arranged for both Kyle and Michael to be seen by therapists as they aged to make sure that they were reaching developmental milestones.

E.S. (Emily), who was eighteen years old at the time of trial, is Mother's sister. Emily testified that Mother "always put[] [Kyle] first" and that Kyle was always happy and engaged in various activities when he was with Mother. She

31

also explained that Mother actively parented Michael, that he was always "right beside her," and that she was protective of him. Emily visited Kyle after his removal from Mother's care, and he was happy to see her; Emily explained that she could not imagine the effect that the termination of Mother's rights would have on Mother's extended family.

Emily acknowledged, however, that Mother had never extensively discussed Kyle's injuries with her and that when Mother had talked about the injuries, she had stated that she "didn't know who did it." Emily also conceded that she did not "really know anything about [Daniel]," but she testified that she did not believe that he had abused Kyle.

D.R. (Donna), one of Mother's aunts, testified that Mother had told her that Kyle's babysitter abused him. But Donna testified that Mother is a good parent and that she had the support of several family members in New Mexico.

**Mother's completion of her service plan**

After Kyle's removal from Mother's care in the summer of 2013, she called CPS repeatedly because she wanted to start her service plan and be reunited with him. She got the service plan more than a month after Kyle's removal. She completed all tasks assigned to her in the service plan, including participating in therapy, taking an anger management class, managing her income, and taking parenting classes.

Mother understood from talking to Martinez that when she completed her service plan, Kyle would be returned to her custody. Thus, Mother expressed

32

her belief that Kyle should have been returned to her in February 2014, as soon as she completed the services. She recognized that she had sex with Daniel and allowed him to sleep at her house (leading to the March 2014 domestic disturbance) after that time, but she explained that "things would have been different" if Kyle had been in her care.

Concerning the fact that Mother had completed all of the tasks within her service plan, Akbar testified, "[S]he can finish her classes, but if she's not able to demonstrate and show that she has learned from them, then it's technically not successful." Tricksey testified that Mother did not complete a "goal" of the service plan because she did not demonstrate a willingness and ability to protect Kyle from further abuse.

**Victor and Laura's desire to obtain Kyle's custody**[15]

Laura remained involved in Kyle's case from the time of his removal until the trial with the goal of either achieving his placement in her home or his return to Mother's custody. Mother and Laura often came together from New Mexico to Texas to visit Kyle while he was in foster care. Each visit lasted three hours.

Like Mother, Laura was reluctant to accept that Daniel was Kyle's abuser; Laura testified that her opinion about whether Daniel had caused Kyle's injuries

---

[15]We hold below that Mother does not have standing to contest the part of the trial court's judgment that grants permanent managing conservatorship to the Department. However, we include the facts in this section because we conclude that they are relevant to our application of the *Holley* factors discussed above. *See* 544 S.W.2d at 371–72.

had "evolved" over the course of the Department's case. At trial, Laura recognized that Kyle "could have" been hurt by Daniel along with a child that Kyle had been with.

Victor, a retired naval officer, resides with Laura in New Mexico. Kyle has a room in the house there. Kyle lived there for more than two months when Mother lived in San Antonio. Victor testified that he had asked the Department to place Kyle in the home and that he and Laura had obtained a foster parent license to achieve that goal. Victor and Laura received training on child safety to obtain the license.

Victor conceded at trial that Daniel had caused Kyle's injuries. He testified that while he did not initially know whether Daniel or Kyle's babysitter had abused Kyle, he later became convinced that Daniel was the abuser. He explained that when he had written the June 2013 letter vouching for Daniel's character, he had believed that the babysitter had abused Kyle (in part, because Mother had "just started using that babysitter"), but he had later believed that Daniel had done so when Daniel confessed.

Victor testified that at a meeting about Kyle's custody soon after his removal from Mother's care, he said, "Do a thorough investigation, investigate both [Daniel and the babysitter]. Whoever is guilty, put [that person] in jail." Victor testified that from the beginning, he wanted the Department to require Daniel and the babysitter to submit to polygraphs about whether they had abused

34

Kyle. According to Victor, when he heard that Daniel was being charged with abusing Kyle, he said, "Good. I hope they put him in jail."

When asked why he and Laura wanted to raise Kyle, Victor testified,

> I am an example of many, many kids that follow me, and they're very successful. I believe if I have [Kyle], . . . I can teach him to be a very good man, to love God, and to be a very productive young man when he grows up. I will ensure . . . that he'll go to . . . Christian schools . . . to understand what God is; go to college, make him a beautiful musician. That's what my kids are.

> And number two is, I want him to be a good engineer, because I found out that music and engineering are so much related. And, most of all, I just want him to be with me and my wife so we can show all that to him. We'll protect him.

Victor expressed that he did not know why the Department was opposed to allowing him and Laura to obtain Kyle's custody. He recognized that Kyle needs continued therapy related to the emotional trauma he had suffered from; Victor testified that he would arrange for the therapy to continue in New Mexico.

Victor has the top possible security clearance within the federal government, and the government investigates his background every five years before renewing the clearance. He and Laura sponsor ROTC groups at three New Mexico high schools and donate money to provide scholarships for students in those groups. Victor testified, "I mentor the young kids as [freshmen] to tell them to go to college, not to drink[,] and believe in God." Victor explained, "I work, I pay my bills, I do all those things. [Laura], my wife, takes care of me, takes care of the house[,] and takes care of [Kyle]. So between the two of us, I believe we can provide a very nice home for [Kyle]."

35

Ward visited Kyle in his foster home seventeen times and discussed Kyle with Laura and Victor through several phone calls and in person. Ward opined that Laura and Victor may not be able to provide a safe home for Kyle because Laura did not believe his outcries, defended Daniel, and blamed Kyle's babysitter for his injuries. Ward testified, "[Laura] was more focused on the babysitter than she ever was on [Daniel]."

The Department declined to place Kyle with Laura and Victor, and although Tricksey recognized that CPS's general goal is to place a child with family members if the child cannot be reunited with a parent, she testified that no party had asked the trial court for a hearing to challenge the Department's decision to not place Kyle with Laura and Victor.

**Kyle's development with his foster family and his continuing need for therapy**

Kyle suffered emotional trauma after Daniel physically abused him, but when the trial court terminated Mother's parental rights, Kyle was thriving with his foster family and was benefiting from the treatment that he was receiving there. Theresa Davis, a licensed social worker, began providing therapy to Kyle in September 2013 (when he was four years old) and had been doing so on a weekly basis for approximately a year at the time of the trial. When Davis first met Kyle, she assessed his social, mental, and physical capacity, and she diagnosed him as having post-traumatic stress syndrome with anxiety. In September 2013, Davis noticed that Kyle's self-esteem was very low and that he

36

had difficulty trusting her. By the trial a year later, after building rapport with Davis by playing with her in his room, Kyle trusted her. He eventually began to speak about his feelings and about Daniel's abusing him.

Several months before trial, Kyle told Davis that in the past, Daniel, who was living with Kyle, had gotten angry with him and had punched him with a closed fist. Kyle told her that he was scared of Daniel; she believed from his statements that the abuse occurred multiple times. According to Davis, Kyle's post-traumatic stress syndrome manifested in "avoidance behavior," flashbacks, withdrawal, bedwetting, poor communication skills, and "always wanting to be reassured that . . . he's safe." Davis recognized, however, that some of these behaviors could have resulted from Kyle's anxiety about being separated from Mother. Davis acknowledged that she did not know whether Kyle had suffered from anxiety before his removal from Mother's custody.

During Davis's counseling of Kyle, she asked his foster family to reassure him, give him safety and consistency, and get him involved in social activities. The foster family provided a safe environment, and Kyle improved while staying there. For example, Davis testified, "[Kyle's] able to trust now. . . . [H]is self-esteem is better. He doesn't fall as much . . . . He talks more. He laughs more. He shows expression more . . . . So, yes, he has progressed and he's continuing to progress." Even so, Davis stated that Kyle required therapy for at least another year and that to overcome the post-traumatic stress syndrome, Kyle needed to remain in a consistent, trusting, loving, and safe environment.

37

Davis recognized that Kyle missed Mother and had said so in every therapy session, including a session that occurred the day before trial. She explained that while Kyle cried about missing Mother toward the beginning of his therapy, he had learned to cope with his emotions more toward the time of trial. Davis also recognized that Kyle was excited about having a little brother. Even considering Kyle's emotions for Mother, Davis opined that he should stay in his foster home because it provided the consistency and safety that he needed to be successful. Davis never talked to Mother, Laura, or Victor. She recognized that Kyle's family loves him.

According to Akbar, after Kyle's visits with Mother ended, he was usually happy to go back to his foster home and play; she only saw Kyle cry once when a visit with Mother ended. Akbar testified that Kyle was thriving in his foster home and that his foster family would consider adopting him. Martinez testified that Kyle was happy in his foster home and that he had a good relationship with other children in the home.

Ward agreed that Kyle had thrived in his foster home. She explained that he seemed to be "calm and comfortable" and that he felt safe and secure there. She asked the trial court to allow Kyle to remain in his foster home until a permanent home could be found for him.

**The trial court's determination**

After a careful review of all of the evidence admitted at trial, including the facts summarized above, we must conclude that the evidence is legally and

38

factually sufficient to prove that termination of Mother's parental rights is in Kyle's best interest. *See J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. Despite Mother's statements that she would ensure Kyle's safety in the future, from Mother's repeated actions in the past, the trial court could have reasonably discounted her ability to permanently keep Kyle safe from further physical and emotional harm caused by either Daniel or another man.[16] *See In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied) (explaining that a factfinder is free to "reject [a parent's] assertions of future stability and of having learned from her mistakes"); *see also R.R.*, 294 S.W.3d at 234 (stating that the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest).

The evidence shows that Mother exposed Kyle to physical abuse through relationships with two men; that she continued to live with each of those men, maintain intimacy with them, and expose her children to them after the abuse occurred and despite being advised to do otherwise; that she was reluctant to accept Daniel's responsibility for abusing Kyle despite Kyle's repeated outcries and the fact that Daniel had exclusively cared for him on the day that he went to the hospital; that she minimized Kyle's injuries although they were extensive; that

---

[16]Mother argues on appeal that she now "realizes that she must be much more careful about men."

she may have instructed Kyle to cover up the abuse;[17] that she made poor choices in her relationship with Daniel even after Kyle's removal, when she knew that her relationship with Kyle was in jeopardy and when she had custody of Michael; that she declined to report those choices to the Department; and that as of May 2014, after Daniel's arrest for abusing Kyle, Mother still professed that she loved Daniel. *Cf. R.R.*, 294 S.W.3d at 234 (explaining that in determining whether a parent is willing to provide a child with a safe environment, a court should consider the magnitude and frequency of harm to the child and whether there "is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home"); *see also C.B. v. Tex. Dep't of Family & Protective Serv.*, 440 S.W.3d 756, 770 (Tex. App.—El Paso 2013, no pet.) (considering a mother's repeated relationships with violent men, which continued after the violence occurred and resulted in abuse against one of her children, as evidence that the mother had failed to "put the safety and welfare of her children first" and that termination of the mother's rights was in the children's best interest); *In re J.L.W.*, No. 02-08-00179-CV, 2008 WL 4937970, at *9 (Tex. App.—Fort Worth Nov. 20, 2008, no pet.) (mem. op.) (holding that termination of

---

[17]According to Anderson, Kyle told her that Daniel had hit him and that Mother had instructed Kyle to say that he fell if anyone asked him what had happened. Mother denied that she had told Kyle to say that he fell. "[T]he fact finder, as opposed to the reviewing [court], enjoys the right to resolve credibility issues and conflicts within the evidence. It may freely choose to believe all, part, or none of the testimony espoused by any particular witness." *In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.).

a mother's parental rights was in a child's best interest when the mother had an "individual history of abusive relationships" and had failed to "protect her other children from the men with whom she had had abusive relationships"). The evidence also establishes that Kyle was suffering from emotional trauma (along with his physical injuries) upon his removal from Mother's custody but that he was recovering and developing well and was happy and secure while residing in the foster home after his removal. *Cf. R.R.*, 294 S.W.3d at 234 (stating that a court should consider the results of psychological evaluations of the child); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (concluding that stability and permanence are important to the growth of a child and affirming a finding that termination was in a child's best interest when the child was thriving in foster care); *In re U.P.*, 105 S.W.3d 222, 230–31 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) (considering a child's bond with a foster family as a factor supporting the child's best interest in the termination of a father's parental rights).

Although the evidence shows that Mother completed her service plan, it also demonstrates that after she did so, she continued to make decisions in her relationship with Daniel that she later conceded were not in Michael's best interest. *Cf. In re A.C.B.*, 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.) (holding that although a parent's performance of a service plan is likely to fulfill some of the *Holley* factors, service plan compliance alone will not prevent termination of a parent's rights); *In re M.G.D.*, 108 S.W.3d 508, 513–15 (Tex.

41

App.—Houston [14th Dist.] 2003, pet. denied) (holding that termination of the mother's parental rights was in the children's best interest despite the fact that she completed her service plan). And although Mother argues that child-protective authorities and family in New Mexico could monitor Kyle's return to her care to ensure his safety, the trial court could have reasonably found that the danger to Kyle would not abate because Mother had continued to expose Michael to Daniel, whom Kyle had named as his abuser, while disregarding recommendations from family members and while the Department was closely scrutinizing her actions.[18]

The record contains evidence that a factfinder could have weighed against termination, including Mother's diligence in visiting Kyle and the bond that they shared during those visits; the facts showing that Mother and Kyle missed each other and that Kyle had bonded with Michael; evidence of Mother's positive parenting skills that were unrelated to keeping Kyle safe; and the availability of familial support to Mother in New Mexico, including Laura and Victor, if the court did not terminate her parental rights. But we conclude that even considering these facts, the trial court could have reached a firm conviction or belief that termination of Mother's parental rights was in Kyle's best interest based on the

[18]Also, as explained above, Mother's family, like Mother, was slow to accept Daniel's sole responsibility as Kyle's abuser despite Kyle's outcries that named him and the Department's prompt determination that Kyle's babysitter was not responsible for his injuries.

42

other facts described above. *See J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28.

In terminating Mother's parental rights, the trial court followed the recommendations of his counselor, Davis (at least to the extent that she believed Kyle should "stay in his foster home"); his CASA advocate, Ward;[19] his attorney ad litem; and Mother's caseworkers, Martinez and Akbar. Davis and Ward had extensive personal interactions with Kyle before giving their recommendations, and Martinez and Akbar had similar interactions with Mother. After carefully considering all of the evidence presented in the trial court in light of the *Holley* factors, we cannot second-guess the trial court's decision to accept these shared recommendations and to find that termination of Mother's parental rights to Kyle is in his best interest. *See* 544 S.W.2d at 371–72. We acknowledge that the termination of Mother's parental rights to Kyle is tragic; we cannot conclude it is erroneous. We overrule Mother's first issue.

**Conservatorship Determination**

In her second issue, Mother argues that the trial court abused its discretion by naming the Department as Kyle's permanent managing conservator, continuing his placement in foster care, and not naming Laura and Victor as his possessory conservators. Laura and Victor were not parties to the litigation in

---

[19]Ward testified that she did not take her recommendation of termination lightly and that recommending termination of parental rights is "very difficult."

43

the trial court, nor are they parties in this appeal; we have not been directed to any place in the record that establishes their attempt to formally intervene.[20]

Because we are affirming the trial court's order terminating Mother's parental rights to Kyle, she has become a former parent with no legal relationship to him. *See* Tex. Fam. Code Ann. § 161.206(b); *In re Y.V.*, No. 02-12-00514-CV, 2013 WL 2631431, at *1 (Tex. App.—Fort Worth June 13, 2013, no pet.) (mem. op.). As such, Mother lacks standing to attack the portion of the termination order appointing the Department as Kyle's managing conservator.[21] *See Y.V.*, 2013 WL 2631431, at *2; *see also In re H.M.M.*, 230 S.W.3d 204, 204–05 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *In re Lambert*, 993 S.W.2d 123, 132 (Tex. App.—San Antonio 1999, orig. proceeding) ("Former parents do not have standing to invoke the trial court's continuing jurisdiction over managing conservatorship issues."); *Ryder v. State*, 917 S.W.2d 503, 505 (Tex. App.—Waco 1996, no writ) (mem. op.). Accordingly, we overrule Mother's second issue.

---

[20]We note that the trial court's termination order does not expressly prohibit his future placement with Victor and Laura; it authorizes the Department, as Kyle's permanent managing conservator, to place him for adoption in a suitable home.

[21]Standing is a non-waivable component of subject matter jurisdiction that we may raise on our own motion. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993).

## Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment terminating her parental rights to Kyle.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  May 28, 2015